Filed 8/17/16  In re S.P. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E065436 |
| Plaintiff and Respondent, | (Super.Ct.No. J261811) |
| v. | OPINION |
| C.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

1

C.P. (father) is the biological and presumed father of S.P. (minor). B.G. (mother) is minor's biological mother; she is not a party to this appeal. Father appeals from the juvenile court's finding that his substance abuse interfered with his ability to parent minor, which placed her at substantial risk of suffering serious physical harm or illness, and from the court's order denying minor's placement with him. For the reasons set forth below, we shall affirm the juvenile court's findings and order.

## FACTUAL AND PROCEDURAL HISTORY

In August of 2015, San Bernardino County Children and Family Services (CFS) received a referral from the Children's Assessment Center that minor (then six years old) had been sexually abused by E.M., mother's boyfriend. Mother (then age 23) and father (then age 25) were no longer together. Mother had engaged in domestic violence with both E.M. and father.

Minor told the social worker that her "dad," E.M., would make her watch movies and pictures of naked women on his phone. He would also put his hand inside her clothes, but not under her underwear. He also had minor put her hand inside his clothes, but not in his underwear. Minor knew that people should not touch children's private parts.

Minor said she felt safe with mother and had not seen father "in a very long time." Mother and father (collectively, parents) were married a few months after minor's birth and father's name was on her birth certificate. According to mother, however, father had not seen minor since December of 2014.

On August 31, 2014, CFS filed a petition under Welfare and Institutions Code[1] section 300 on behalf of minor. The petition included several section 300, subdivision (b), allegations against father. It alleged that father failed to protect minor by failing to provide her basic needs of food, shelter, clothing and medical attention; by engaging in domestic violence, which placed minor at risk of physical and emotional harm; and by abusing substances, which impeded his ability to provide adequate care and supervision of minor. The petition also alleged under section 300, subdivision (g), that father's whereabouts were unknown and father failed to provide support.

Father did not appear at the detention hearing held on September 1, 2014. Mother did not know his whereabouts. The court found a prima facie case for detaining minor from father. She was to remain in the custody of mother under the supervision of the court, on the condition that father and E.M. not stay in the home and not have any contact with minor outside of CFS's supervision. The court did not order visitation with father at that time. The court did order the parents to submit to random or same day testing for controlled substances, as directed by CFS.

The jurisdiction/disposition report recommended that minor be removed from the custody of her father and he be provided family reunification services. The report recommended that minor remain in mother's custody with family maintenance services.

Mother married father when she was 16 years old. Parents' divorce was never finalized, even though the marriage ended "years ago" due to father's ongoing issues with

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

3

substance abuse and domestic violence. Mother reported that father had not seen minor in over a year. According to the paternal grandmother (PGM), father was still using drugs and not doing well.

On September 15, 2015, the social worker was able to contact father. He denied the allegations against him; he refused to take a drug test. He did admit that he was ordered to NA and AA groups in family court in 2012. Father, however, only admitted to alcohol use. He refused to explain why he was ordered to attend NA meetings.

Although father denied domestic violence in the relationship, he acknowledged that mother had obtained a year-long restraining order against him from October 2012 to October 2013. Father claimed that he was trying to restrain mother from going out and using drugs. He grabbed her and fell "into the wall." This created a hole in the wall. Mother was kicking and biting, trying to get away. Neighbors heard mother screaming and called the police. Father claimed that he was not arrested.

According to father, who admitted that he did not have a stable residence, he was given weekend visitation with minor. However, he had not had a weekend with minor since February 2015. Father claimed he did not have transportation at the time of the report. He did not keep in touch with minor by phone and only saw her when she visited PGM; PGM made arrangement for father to visit.

Father appeared at the jurisdiction/disposition hearing on September 22, 2015. He waived formal reading and advisal, and submitted. The court ordered one hour of supervised visitation per week between father and minor. The court authorized CFS to increase visitation as to frequency and duration. The court continued the matter.

CFS filed an amended section 300 petition, which eliminated the section 300, subdivision (g), allegation since father's whereabouts were now known. The amended detention report of October 13, 2015, recommended that minor be detained with E.M.'s mother, A.L.

Mother had relapsed on October 2, 2015, and began using drugs for several days. She had made arrangements for A.L. to care for her children. Mother left the home but visited daily. Mother signed a declaration and agreed to leave minor in the care of A.L. until mother entered treatment.

Father was not present at the detention hearing on October 13, 2015. Father's counsel waived formal reading and formal advisal of rights. Counsel entered denials on father's behalf and had no comments as to the detention recommendation.

The court found a prima facie case was established for detention from the parents. The court ordered weekly, supervised visits of one hour for father and minor.[2] The court again ordered parents to submit to random and/or same day testing for controlled substances.

Father was not present at the further jurisdiction/disposition hearing on October 20, 2015. The court continued the matter for CFS to complete giving notice to E.M.

On November 12, 2015, at the continued hearing, father was present. Father objected to the recommendation and was interested in family maintenance. The court

_____

[2] Although the court increased only mother's visitation to twice a week, the minute order erroneously indicated that the court also increased father's visitation to twice a week.

ordered mediation, followed by a pretrial settlement conference and short cause trial. The court ordered father to drug test that day and advised that failure to do so would be deemed a positive test.

At the mediation, father contested the jurisdictional allegations, and disagreed with the disposition recommendations. CFS filed an Information for the Court dated December 17, 2015, reporting that father initially was not cooperative, but over the last month, had made himself available and had four negative drug tests between November 12, 2015, and December 11, 2015.

At the pretrial settlement conference on December 17, 2015, father was present. Father contested the matter. CFS filed another Information for the Court on January 11, 2016. Father had not begun any services as of the date of the filing, and continued to deny a substance abuse history. CFS had been attempting to set up services for father since November, but CFS could not contact father. Although the social worker left messages with various relatives, father did not return calls. CFS finally contacted father in January 2016 to set up services. Father, however, reported that he was already enrolled in counseling and domestic violence classes. He could not give a name or location of the treatment center. Moreover, father appeared confused and unable to understand the information the social worker gave him. He was also unable to control his body.

At the contested jurisdiction/disposition hearing on January 13, 2016, father's counsel submitted father's enrollment forms for domestic violence and parenting and education classes. Father was contesting the jurisdiction allegations.

6

CFS called mother as the first witness. She testified that she began living with father when she was 15 and he was 17 years of age. They continued to live together until 2012. They were still legally married at the time of the hearing.

Mother testified that she and father used illegal drugs together from the time she was 19 years of age (2011) until 2012. Mother claimed that it was father who "got [her] started" using illegal drugs. Crystal methamphetamine was their drug of choice and they used almost on a daily basis. Father recently told her that he had been clean for nine months and that he led NA meetings in San Bernardino. Father claimed that he had proof that he was clean.

Mother stated that father left her and minor in October of 2012. He had contact with minor until 2014. Minor cried wanting to see father. Mother called PGM who stated that father "wasn't doing so good and he was messing up again."

Mother also testified that she and father had engaged in domestic violence twice. When it did happen, it "was pretty violent; pretty bad." The first incident occurred in 2010 when they were living in Mexico. Parents had been arguing at father's sister's birthday party. Mother had been talking to another man and father pushed the man, then pushed mother. She fell backwards and hit her head. Mother reacted by hitting him and breaking his teeth. They both had been drinking.

The next day, parents had been drinking and she wanted to leave him in Mexico and return to the United States. She told him she wished he would die. He grabbed a knife, put mother's hands around it, and stabbed himself twice in the abdomen and twice in the leg.

7

The second domestic violence incident occurred in 2012. Parents went to mother's father's home for a barbecue. Both mother and father had been drinking. When they returned home, mother wanted to invite over some friends but father did not. According to mother, father knocked a plate of food out of mother's hand. The plate hit the wall. Mother and father began pushing each other and father held mother down and was hitting her in the face. He also bit mother's face and nose. Mother screamed so father bit her lips shut. Mother hit and kicked him, pushing him into the drywall. She was able to escape, screaming. Neighbors called the police.

Mother stated that she had scabs, bruises, and bite marks. She also injured her foot when she escaped through the door. Mother did not press charges because she was afraid father would be deported, but she did get a restraining order. The incident ended parents' relationship. The restraining order, which was part of the divorce proceedings, prevented father from going near or contacting mother. The restraining order was originally for five years. However, after one and one-half years, father challenged it. Mother was living in Bakersfield at the time and could not attend all of the hearings. She failed to turn in the proper paperwork. The court rescinded the order. Mother did not consider refiling another restraining order because there was no longer a need.

Parents also had a custody arrangement where they both had legal custody, and mother had full physical custody of minor. Father would visit minor on weekends. Mother testified that she had no concerns when minor, for several months, spent every weekend with father. Mother did not know if father engaged in domestic violence with

8

other women. PGM, however, would advise mother if father was doing "okay" or if he was homeless and using again. Father was living with PGM at this time.

CFS called father as its second witness. Father admitted that he had a history of alcohol use, and that he did not tell the social worker that he had a history of methamphetamine use. He testified that he did use methamphetamine with mother. Father could not remember when he began using drugs. He stopped abusing drugs before he and mother separated.

Father claimed that he probably started using drugs in 2011. He did not use drugs when he was a teenager. The last time he used drugs was in October of 2012. He told mother he had been leading NA classes for the previous nine months. However, he had been clean since 2012.

Father attended NA meetings twice weekly because they were court ordered. He did admit that he had not attended for the previous three weeks. Father testified that he used to go to NA meetings twice weekly and at the time of the hearing, he only attended once a week. Even though he had not used drugs since 2012, father still attended the meetings because he "liked to see other people recover as well."

Father admitted to the two incidents of domestic violence described by mother. He stated that they had both been under the "influence of alcohol and stuff." Since their separation, father claimed that he had not engaged in domestic violence; the previous weekend, he enrolled in a domestic violence program.

Twice a week, father attended anger management and parenting classes that were part of the NA meetings. Father completed the classes and filed the certificates with the family court in 2013. Father claimed his copies were lost when his car was stolen.

Father did not attend a substance abuse treatment program. When he quit drugs, he claimed he never relapsed because of the support he had received from family, friends, and church members.

Father lived with PGM until February 2015 when she asked father to leave because he failed to comply with her house rules. He would return home late or not at all. Father, however, denied using drugs. He did not drink alcohol for several months. He stated he did not drink to get drunk. He would only have one or two drinks.

For the last three months, father had been living with a friend in Whittier. He slept on an inflatable mattress or on the couch. According to father, the friend was a daughter of a member of the Los Angeles Police Department. She required father to have a background check and be drug tested.

Father helped to pay for the rent but did not sign the lease. For the last two years, father worked intermittently for an electrician as an apprentice. He intended to begin school in the spring to get his license as an electrician.

If minor were returned to father, he stated he would move back to PGM's home; she invited him to return home because she saw father was "getting his act together." Father thought minor could move in with him in Whittier, but he had not discussed it with his friend. The home was a one-bedroom house where his friend and her six-year-old son lived.

10

Father testified that he had never been arrested and never had a child welfare history until minor was removed. He was not in the home at the time of her removal. He had been drug tested four or five times and had not missed any drug tests.

Minor's counsel asked father what he meant when testifying that PGM observed him getting his act together. Father answered that he had a job, a home, attended church regularly, and visited his family. He was becoming more financially stable and making goals, such as attending school.

Father claimed that he quit visiting minor because he did not have a job or transportation to get to her. Moreover, he had no phone. The court clarified with father that he had not seen minor for about eight months.

According to minor's attorney, father missed a family law hearing in April 2015 when the divorce was finalized. Father knew that the visitation order allowed him to have minor the second and fourth weekends of the month, but he did not visit regularly. If minor were returned to him, he stated that PGM would care for minor while he went to work.

The social worker testified that father adamantly denied having any substance abuse history at all. Although father admitted to drinking a beer or two, he denied any past or present substance abuse problem.

Since father was not a citizen of the United States and he did not have a social security number, the social worker had difficulty running a background check on him. He was first asked to drug test in September. Father did not test due to lack of transportation. The social worker then set up random testing for father. Father did not

test until the middle of November. He did not show for the four random tests between September and November; father missed a total of five tests. Father then tested four times; those tests were clean.

Father had been visiting minor regularly since November 2015 under the supervision of PGM. Minor enjoyed the visits. Although father had not discussed with his roommate having minor move in with them, father thought that minor could sleep in the same room as father, his roommate, and his roommate's child. The social worker reported that father "also asked about if he could give minor to [PGM]. Basically he wants [minor] returned to him and then give her over to [PGM]."

The social worker had spoken with the PGM several times. Although she had acknowledged that she "kicked" father out of the home and he needed to get his life together, the PGM would not give any details or the reason for father's expulsion from her home.

The social worker recommended family reunification services for father since he had a history of instability. He only recently reentered minor's life and had consistent contact with her for only two months. He also only had a stable residence for a short period of time. The social worker concluded it was too soon to return minor to father.

The social worker was also concerned about the severity of the violence in the domestic violence disputes. Stabbing and biting were involved in the altercations between parents.

Moreover, the social worker was still concerned about father's substance abuse issues. Although there were no arrest reports regarding drugs, his behavior was

12

consistent with drug use. He was "very, very resistant" to begin services, stating he did not need them. It was only during father's testimony that the social worker became aware father was attending NA meetings; he never told the social worker and this concerned her. She had been attempting to arrange services for father since November 2015; they were finally arranged one week prior to the hearing. CFS was unable to contact father. The social worker had several telephone numbers for father, but they were wrong. Furthermore, father did not return phone calls. The clerk documented all attempts to set up services. The previous week, father finally told the clerk he was in services but could not give a name or location of the services. The social worker concluded that father was not being truthful.

The social worker testified that based on the drug testing, father had only been clean for two months. Given that he had a substantial drug history, being drug-free for only two months was a problem. The court interjected that a substance abuse problem was an ongoing issue.

The social worker explained that at the mediation, she discussed amending the allegation to read that father's substance abuse history, which led to a longer period of instability and no contact with minor, negatively impacted minor.

Currently, the social worker was not recommending family maintenance if father moved into PGM's home. She acknowledged that PGM loved minor, and minor was safe with her. However, PGM was also very protective of father. Moreover, the PGM would not discuss the reasons father was "kicked out" of her house, and when asked if father had a substance abuse history, she responded, "I haven't seen it." The social worker

concluded that if at some point minor was returned to father, it would be better if he lived with PGM.

The social worker confirmed at that time she was not recommending return of minor. Instead, she was recommending father be enrolled in services and to show that he benefitted from those services.

The juvenile court found the allegations under section 300, subdivisions (b)(1) through (b)(3) against mother to be true. The court also found the allegations under section 300, subdivisions (b)(4) (father failed to provide minor with basic needs), and (b)(5) (father had a history of engaging in domestic violence, which placed minor at risk of physical and emotional harm) were not true.

The court found the substance abuse allegation under section 300, subdivision (b)(6) to be true based on several factors. The testimony of mother and father revealed that father lacked credibility since statements he made to the social worker and mother, and his own statements conflicted with one another.

The court noted that father denied a substance abuse problem, but also testified that he had been in treatment "for a year or multiple months." Moreover, he told mother that he was leading groups at NA meetings. Although father may have stopped using, his multiple recent failures to test within the prior six months were considered positive tests.

The court also recognized that father's behavior corroborated a substance abuse problem. Father had unstable housing, failed to test, and failed to visit for a long period of time, especially for a six or seven-year-old child. Also, father had only recently started services and was unavailable to the social worker at the beginning of the case when the

14

social worker attempted to contact him to enroll him in services. The court acknowledged that father recently began engaging in services but "a substance abuse problem is a problem that takes more than just a few clean tests to say that you're stable enough to be a parent."

As to father, the court ordered a minimum of two hours, supervised, weekly visitation with authority for CFS to liberalize visitation as to frequency, duration and supervision.

The court ordered reunification services for father and gave CFS authority to refer father to family maintenance as appropriate. Some of the conditions that would support family maintenance were the relative home being assessed and father being able to move into the home at some point.

Father appeals.

## DISCUSSION

A.    SUBSTANTIAL EVIDENCE SUPPORTS THE COURT'S JURISDICTIONAL FINDING

Father contends that "the jurisdictional finding as to present substantial risk of serious physical harm or illness due to father's purported substance abuse is not supported by substantial evidence." (All caps, all boldface omitted.)

### 1.    *LEGAL BACKGROUND*

When an appellate court reviews the jurisdictional findings of the juvenile court, it looks to see if substantial evidence, whether contradicted or uncontradicted, supports the findings. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184 (*Natalie A.*).) The appellate

15

court must review the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in favor of the prevailing party. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) Substantial evidence "means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case.'" (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.)

The appellant has the burden to show that the evidence was not sufficient to support the findings and orders. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.) The reviewing court may not reweigh the evidence or express an independent judgment. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) Rather, the reviewing court must determine whether "a *reasonable* trier of fact could have found for the respondent based on the whole record." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

If a child is found to be a person described by section 300, and thus a dependent of the juvenile court, the court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362.) The juvenile court has broad discretion to fashion a disposition order. (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319.)

16

Although dependency jurisdiction attaches to a child, not to his or parents, an appellate court has the discretion to reach the merits of a challenge to any jurisdictional finding when that finding may be prejudicial to the appellant. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; *In re D.P.* (2014) 225 Cal.App.4th 898, 902.)

### 2. *ANALYSIS*

In this case, the juvenile court found that minor came within the jurisdiction of the court under section 300, subdivision (b)(1), which states: "The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." Section 300.2 states that "[t]he provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment."

### (a) Substantial Evidence Supports the Court's Finding Father Abused Drugs

In *Natalie A.*, *supra*, 243 Cal.App.4th 178, the court listed several behaviors consistent with parental substance abuse. Among those behaviors were "continued unemployment, [a] transient living situation, and . . . failure to enroll in drug treatment programs." The court also noted that a "reasonable inference could be drawn that father's [drug] use was more frequent" than father admitted. (*Id*. at pp. 185-186.)

Here, the social worker testified that father's history of instability and resistance to drug treatment services was consistent with drug use. Although there were no arrest reports, his behavior indicated that father was still using drugs. Additionally, as late as January 2016, father could not give the name and location of the treatment center he was allegedly attending. Moreover, father appeared confused and unable to understand the information the social worker gave him. He was also unable to control his body.

Father's testimony revealed the behavior pattern of a drug abuser. For several months, he denied using drugs. He then admitted to using drugs, but claimed he quit in October 2012 and had not used since. However, he had been ordered to attend NA meetings in family court. Father claimed that he completed NA meetings in 2013. Notwithstanding, father was still attending NA meetings, and was also leading them. Moreover, father had a transient living situation. He moved from PGM's home in February 2015. He did not have a stable address until October 2015, when he moved into a friend's one-bedroom apartment in Whittier. The friend also had a child. Father slept on the couch or on an inflatable mattress in the bedroom with his friend and her child. Although father did not ask his friend for permission, he expected the friend to allow minor to move into the friend's one-bedroom apartment with them. Father was not listed on the lease. Furthermore, father continued to be unemployed or underemployed. He testified that he had only worked intermittently for the last two years as an electrician's apprentice.

In addition, father's testimony lacked credibility when he claimed that he attended NA meetings because he liked "to see other people recover as well." He testified that he

18

had been leading NA meetings in San Bernardino for the previous nine months. However, he was living in Whittier since October 2015, approximately 55 miles away. Moreover, father missed five drug tests between September and November 2015, and also had not visited minor in San Bernardino for 10 months between February and November 2015, because he lacked transportation.

Also, mother testified that it was father who "got her started" using crystal methamphetamine, which was their daily drug of choice. When father quit visiting minor in 2015, mother called PGM; PGM told mother that father "wasn't doing so good and he was messing up again." Mother stated she had no concerns with minor spending weekends with father because, at that time, he was living with PGM. According to mother, PGM would advise mother if father was doing "okay" or if he was homeless and using drugs again.

Based on the facts set forth *ante*, substantial evidence supports the juvenile court's finding that the substance abuse allegation against father was true. The court noted that the substance abuse problem was an ongoing issue. "Well, a substance abuse problem doesn't mean they are using today. A problem is, as everyone knows, substance abuse is an ongoing issue that, if you're an addict, . . ." it is a daily challenge. Here, the testimonies of mother and father revealed that father had a "fairly long-standing" drug issue. The court noted father denied drug use but admitted that he had been in treatment for a year or multiple months; his missed tests were considered to be positive. The court also noted that father lacked credibility since statements father made to the social worker, mother, and father's own statements conflicted with each other.

19

(b) <u>Substantial Evidence Supports the Finding Father's Substance Abuse Interfered With his Ability to Parent</u>

Although section 300 generally requires proof that the child is subject to the defined risk of harm at the time of the jurisdiction hearing, the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396; *In re N.M.* (2011) 197 Cal.App.4th 159, 165.) The court may consider past events in deciding whether a child presently needs the court's protection. (*N.M.*, at p. 165.) A parent's "'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

Under section 300, subdivision (b), a child is subject to jurisdiction if minor "suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the . . . parent's . . . substance abuse." This requires the parent's drug use to interfere with a parent's ability to provide adequate care and supervision to minor. In *Natalie A.*, *supra*, 243 Cal.App.4th 178, the court stated that "one of the most salient manifestation[s] of parental substance abuse is . . . '"a failure to fulfill major role obligations at . . . home (e.g., . . . neglect of children or household)."'" (*Id.* at p. 185.) Once the juvenile court in *Natalie A.* concluded that a parent had a drug abuse problem, it agreed with the court in *In re Drake M.* (2012) 211 Cal.App.4th 754, that a "finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm." (*Id.* at p. 767.)

20

In this case, father's profile fits the *Natalie A.* profile of a drug abuser who failed to fulfill his major role obligations at home by neglecting his child. Mother said that father had not visited minor since December 2014. Father said that he had not seen her since February 2015, and failed to keep in touch with her by telephone. When father did see minor, it was only because PGM had made the arrangements for father and minor to visit. From minor's perspective, it was a "very long time" since she had seen father.

Father's absence was very upsetting to minor. She would cry because she missed him and wanted to speak with him. Father most likely knew the effect his absence had on minor since mother told PGM; she was in contact with father. Notwithstanding, father did nothing about it.

Moreover, for the prior two years, father only worked intermittently. Because father did not have a stable job, he did not provide any financial support for minor since at least January of 2015. As a result of father's transient lifestyle, he did not have a stable residence to which he could bring minor. He was living with a friend and her child in a one-bedroom residence. He was not named on the rental agreement. He made no arrangements for minor to visit or stay with him.

Father claimed that he had not seen minor, who was living in San Bernardino, for about eight months because he lacked transportation. He, however, found transportation to attend NA meetings in San Bernardino, even though he was not required to attend the meetings, because he liked "to see other people recover." Father's alleged willingness to commute a long distance to see people recover, yet unwillingness to find transportation to commute the same distance to see minor showed that father was willing to parent only

21

when convenient—that he was not yet ready to provide regular care, the lack of which would subject minor to substantial risk of physical harm or illness. Moreover, even after the court detained minor and initiated dependency, father delayed visiting minor for three months.

Nonetheless, father argues that a parent's use of drugs, without more, does not give the juvenile court jurisdiction of minor. In support, father cites to *In re Destiny S.* (2012) 210 Cal.App.4th 999. Father, however, fails to address the phrase, "without more." In *Destiny S.*, the child was 11 years old when she smelled her mother's marijuana smoke, and was frequently tardy to class the prior school year. The court concluded that this did not establish a "substantial risk" that minor would suffer serious physical harm or illness. (*Id.* at p. 1003.)

Here, minor was six years old at the time of the jurisdictional hearing. In *In re Christopher R.* (2014) 225 Cal.App.4th 1210 (*Christopher R.*), the court found that the children, the oldest of whom was six years old at the time of the jurisdiction hearing, were of "tender years" and thus, "'the finding of substance abuse is prima facie evidence of the inability of a parent or guardian to provide regular care resulting in a substantial risk of harm.'" (*Id.* at p. 1219.)

Father also finds support for his argument in *Christopher R.*, *supra*, 225 Cal.App.4th 1210, as rejecting the conclusion in *In re Drake M.*, *supra*, 211 Cal.App.4th 754, that only someone who was "diagnosed by a medical professional or who falls in one of the specific DSM-IV-TR categories can be found to be a current substance abuser. (*Christopher R.*, at p. 1218.) Father argues that since he was not the subject of a clinical

22

evaluation or had a profession diagnosis of substance abuse, there is no evidence to support the finding of jurisdiction based on substance abuse.

However, the court in *Christopher R.* recognized that the formulation in *In re Drake M.*, *supra*, 211 Cal.App.4th 754, was not a comprehensive and exclusive definition of substance abuse. (*Christopher R.*, *supra*, 225 Cal.App.4th at p. 1218.) Instead, the court found jurisdiction based on mother's use of cocaine in the final stage of her pregnancy, "combined with her admitted use of the drug in the past and her failure to consistently test or enroll in a drug abuse program . . . ." (*Id.* at pp. 1218-1219.)

In his reply brief, father cites to *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, in support. The case, however, is inapplicable. In *Jennifer A.*, "the social worker testified Mother did *not* have a drug problem that affected her parenting skills." (*Id.* at p. 1346.) The court, therefore, held that there was nothing to support the conclusion that the use of marijuana "means the children's return to the Mother would create a substantial risk of detriment to the physical or emotional well-being of the children. . . ." (*Id.* at p. 1364.)

In this case, there was substantially "more" than simple drug use. Father's behavior was that of a drug user and clearly indicated that he was unable to provide regular care for minor because of his history of substance abuse. He failed to test consistently or enroll in a drug abuse program. Moreover, father was either unemployed or underemployed and thus, unable to support minor financially. Father did not comply with the family court's visitation order of having minor on weekends because of his

transient lifestyle. Furthermore, father was insensitive to the negative effects his absence had on minor.

Based on the above, the juvenile court's finding that father's drug abuse interfered with his ability to parent minor is supported by substantial evidence.

B.      THE COURT PROPERLY REMOVED MINOR FROM FATHER'S CUSTODY AND REQUIRED FATHER TO ENGAGE IN SERVICES

"The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. (*In re Baby Boy H.*, *supra,* 63 Cal.App.4th at p. 474.) Section 300.2 states: "The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child. Successful participation in a treatment program for substance abuse may be considered in evaluating the home environment."

In this case, the court tailored a rational plan to advance minor's best interests. The plan included reunification services and a CFS approved drug-treatment program.

The social worker testified that returning minor to father at this point would create a risk of harm to minor. Father needed to enroll in services and show that he had benefitted from the services before minor could be placed with him. Given father's history of substance abuse, the social worker was concerned with relapse, without the aid of services. Any relapse would create instability for minor.

Although father wanted minor returned to him, he made no plans for her return. There was no place for minor to live. Father failed to discuss, with his roommate,

24

whether minor could move into her one-bedroom apartment.  Moreover, PGM had not yet been approved for placement, and father had not discussed with PGM whether he could return to her home with minor.  Additionally, the social worker was not yet ready to return minor to father if he lived with PGM because PGM was very protective of father.  PGM had not been forthcoming to the social worker as to why father was asked to leave her home.

Given father's history of substance abuse, his transient lifestyle, and his unemployment or underemployment, the court exercised sound discretion when it ordered that minor not be returned to father's physical custody at present, and that father engage in reunification services.

## DISPOSITION

The juvenile court's jurisdiction findings and dispositional order are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

25